#27857-a-LSW

**2017 S.D. 60**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

  v.

WALTER W. GATERS,                         Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
BROOKINGS COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE GREGORY J. STOLTENBURG,
Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General

CAROLINE SRSTKA
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff
                                          and appellee.


ELLIE M. VANDENBERG
Volga, South Dakota                       Attorney for defendant
                                          and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
ON JANUARY 9, 2017

OPINION FILED **09/20/17**

#27857

WILBUR, Retired Justice

[¶1.]      Officers arrested defendant after they executed a search warrant at his friend's home.  During the search, officers found marijuana in defendant's van parked outside the home.  Defendant moved to suppress the evidence, asserting that the search violated his Fourth Amendment rights.  The circuit court found that defendant did not have a personal, legitimate expectation of privacy in his friend's home and could not challenge the search.  The court alternatively ruled that the search did not violate defendant's Fourth Amendment rights.  Defendant appeals. We affirm.

## Background

[¶2.]      On January 23, 2015, an agent with the South Dakota Division of Criminal Investigation (DCI) informed Detective Dana Rogers of the Brookings Police Department that Joseph Jones may be dealing large quantities of marijuana in the Brookings area.  Jones lived in a trailer home within and near the entrance to the Lamplighter Village Trailer Park in Brookings.

[¶3.]      That same day, Detective Rogers had a pole camera installed on a public street light across from Jones's trailer.  Detective Rogers did not obtain a warrant for the camera.  The camera continuously recorded a street view of Jones's home and front yard from January 23, 2015, to March 19, 2015.  Detective Rogers could view the recordings live or he could look at previously recorded footage to review what had already taken place.  Detective Rogers observed when Jones's vehicle was at the home, when it left, how long it was gone, when visitors came and where they parked, how long they stayed, when pedestrians walked by, etc.

[¶4.]     On March 6 and 11, Detective Rogers reviewed the camera footage and observed Jones leave his home with a black or dark-colored trash bag. Detective Rogers believed Jones took the trash bag to the trailer park's community dumpster. On both days, Detective Rogers rummaged through the dumpster. Detective Rogers identified Jones's trash bags in the dumpster and discovered evidence suggesting drug use. During the garbage search on March 11, Detective Rogers found a letter addressed to Walter Gaters at the South Dakota State Penitentiary. The letter did not contain postage, which indicated to Detective Rogers that Jones never mailed the letter. Detective Rogers testified that he knew Gaters from a past investigation for possession of marijuana.

[¶5.]     Using the information gained from the garbage searches and from the pole camera footage, Detective Rogers prepared an affidavit for a search warrant on March 11 to install a GPS tracking device on two vehicles at Jones's home. On March 13, Detective Rogers submitted a second application for a search warrant for Jones's trailer home. On March 19, 2015, Detective Rogers sat in a patrol vehicle outside Jones's home for several hours. He observed Jones and Gaters arrive at Jones's home in the late afternoon. Detective Rogers saw Jones exit the vehicle carrying a large duffle bag. Jones carried the duffle bag into the home and Gaters followed. After both Gaters and Jones were in Jones's home, Detective Rogers and other officers executed the search warrant. The search uncovered approximately three pounds of marijuana and $27,000 cash inside Jones's home. Detective Rogers also searched Gaters's van, which was located outside Jones's home, and found

marijuana.  Detective Rogers arrested both Jones and Gaters, and the State charged them with drug-related offenses.

[¶6.]        In a consolidated hearing in July 2015, the circuit court considered Jones's and Gaters's separate motions to suppress the evidence seized during the March 19 search.  Jones argued that the use of the pole camera to surveil his home violated his Fourth Amendment rights.  Gaters argued that he had an expectation of privacy in Jones's home, and, therefore, the use of the pole camera violated his Fourth Amendment rights too.  At the conclusion of the hearing, the court orally denied both motions.  It held that "Jones can claim no expectation of privacy for what he does outside his home in full view of the public at large."  In the court's view, "society would not recognize that once you step outside your home that you have an unfettered expectation of privacy."  Because Jones had no expectation of privacy, the court also concluded that Gaters had no expectation of privacy.

[¶7.]        The court issued separate findings of fact and conclusions of law on Jones's and Gaters's motions.  This appeal concerns Gaters's motion; we considered Jones's appeal in *State v. Jones*, 2017 S.D. 59, ___ N.W.2d ____.  In regard to Gaters's motion, the court entered findings of fact on Gaters's expectation of privacy in Jones's home.  The court found that Gaters and Jones were "close friends," that Jones cared for Gaters's cat while Gaters was incarcerated, and that Gaters visited Jones's home often.  But the court concluded that Gaters did not have a reasonable expectation of privacy in Jones's home on March 19 because Gaters had no authority over Jones's home or unfettered access to or right to control the home.  In the court's view, Gaters was "simply permitted to be on the premises."

Alternatively, the court held that if Gaters had an expectation of privacy, the search did not violate Gaters's Fourth Amendment rights.

[¶8.]    Gaters appeals, asserting that the circuit court erred when it held that he had no expectation of privacy in Jones's home and when it denied his motion to suppress.

## Standard of Review

[¶9.]    "A motion to suppress based on an alleged violation of a constitutionally protected right is a question of law reviewed de novo." *State v. Tullous*, 2005 S.D. 5, ¶ 4, 692 N.W.2d 790, 791 (quoting *State v. Hodges*, 2001 S.D. 93, ¶ 8, 631 N.W.2d 206, 209).  We review the circuit court's factual findings for clear error.  *State v. Wright*, 2010 S.D. 3, ¶ 11, 777 N.W.2d 373, 377.  "[B]ut the application of a legal standard to those facts is a question of law, which we review de novo."  *Tullous*, 2005 S.D. 5, ¶ 4, 692 N.W.2d at 791-92 (quoting *State v. Cummings*, 2004 S.D. 56, ¶ 6, 679 N.W.2d 484, 486).

## Analysis

[¶10.]    Gaters argues that he had a reasonable expectation of privacy in Jones's home, and therefore, had standing to challenge the constitutionality of the March 19 search.  He claims that the circuit court applied outdated law when it required Gaters to prove that he had unfettered access to or control of Jones's trailer.  According to Gaters, "this case presents the same facts as *State v. Tullous*" because Gaters was a good friend of Jones's, had known Jones for a long time, and had been Jones's regular social guest.

[¶11.] The Fourth Amendment provides people the right to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. U.S. Const. Amend. IV; S.D. Const. art. VI, § 11. The right is "a personal right; thus an individual must invoke its protections." *State v. Hess*, 2004 S.D. 60, ¶ 11, 680 N.W.2d 314, 319-20. To invoke protection under the Fourth Amendment, an individual must establish "that [he or she] had an expectation of privacy in the location searched or the item seized that society is willing to accept as reasonable." *Tullous*, 2005 S.D. 5, ¶ 6, 692 N.W.2d at 792 (citing *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)). Both this Court and the United States Supreme Court have made clear that a social guest can have a legally sufficient interest in a place other than his or her own so that the social guest may invoke protection under the Fourth Amendment. *Rakas v. Illinois*, 439 U.S. 128, 141-42, 99 S. Ct. 421, 429-30, 58 L. Ed. 2d 387 (1978); *Tullous*, 2005 S.D. 5, ¶ 7, 692 N.W.2d at 792.

[¶12.] In 1960, the United States Supreme Court set forth the first standard: "anyone legitimately on premises where a search occurs may challenge its legality[.]" *United States v. Jones*, 362 U.S. 257, 267, 80 S. Ct. 725, 734, 4 L. Ed. 2d 697 (1960). The Court adopted this view under the concept of "standing." *Id.* at 261, 80 S. Ct. at 731. Eighteen years later, however, the United States Supreme Court "decline[d] to extend the rule of standing" to a third party's claim under the Fourth Amendment. *Rakas*, 439 U.S. at 133, 99 S. Ct. at 425; *accord Hess*, 2004 S.D. 60, ¶ 13, 680 N.W.2d at 320. The court noted that standing "is theoretically distinct from the merits of a defendant's Fourth Amendment claim[.]"

*Rakas*, 439 U.S. at 133, 99 S. Ct. at 425. So the Court "did away with this rubric of 'standing' analysis" and held that merely being "legitimately on the premises" does not invoke the requisite expectation of privacy under the Fourth Amendment. *Hess*, 2004 S.D. 60, ¶ 13, 680 N.W.2d at 320-21 (citing *Rakas*, 439 U.S. at 141, 99 S. Ct. at 429). To claim protection under the Fourth Amendment after *Rakas*, the defendant must demonstrate "a legitimate expectation of privacy in the premises he was using[.]" 439 U.S. at 143, 90 S. Ct. at 430; *Hess*, 2004 S.D. 60, ¶ 13, 680 N.W.2d at 320 ("demonstrate that they personally have an expectation of privacy in the place searched").

[¶13.]    The United States Supreme Court reiterated this standard in *Minnesota v. Olson*, 495 U.S. 91, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990). The Court held that the defendant, as an overnight guest, had a legitimate expectation of privacy in his host's home. *Id.* at 96-97, 110 S. Ct. at 1688. Following *Olson*, a person's status as an "overnight guest" alone was enough to show that a guest has an expectation of privacy in the place of another that society was prepared to recognize as reasonable. Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.3(b), Westlaw (database updated October 2016) (citing cases). But *Olson* did not address whether a shorter-term guest would also have a legitimate expectation of privacy. Some courts interpreted language in *Olson* to mean that under certain circumstances a shorter-term guest could invoke protection under the Fourth Amendment. LaFave, *supra*.

[¶14.]    Then, in *Minnesota v. Carter*, 525 U.S. 83, 91, 119 S. Ct. 469, 474, 142 L. Ed. 2d 373 (1998), the Court "embraced the position that a social guest would not

have to be an overnight guest" in the premises of another to invoke protection under the Fourth Amendment. LaFave, *supra* ¶ 13. In *Carter*, the defendants "were essentially present for a business transaction and were only in the home a matter of hours." 525 U.S. at 90, 119 S. Ct. at 473. The Court found that the defendants were "somewhere in between" overnight guests (deserving of Fourth Amendment protection) and guests merely being permitted on the premises (no Fourth Amendment protection). *Id.* at 91, 119 S. Ct. at 474. The Court ultimately concluded that the defendants did not have a legitimate expectation of privacy—the "situation is closer to that of one simply permitted on the premises"—because the defendants were there for a purely commercial transaction, for a relatively short period, and without any prior connection with the homeowner. *Id.* Justice Kennedy concurred, writing that, "as a general rule, social guests will have an expectation of privacy in their host's home." *Id.* at 102, 119 S. Ct. at 479 (Kennedy, J., concurring). Following *Carter*, courts, including this Court, have recognized that "social guests who fall somewhere between the overnight guest in *Olson* and a guest simply permitted on the premises have a legitimate expectation of privacy and may mount a Fourth Amendment challenge to searches and seizures." *Hess*, 2004 S.D. 60, ¶ 16, 680 N.W.2d at 322 (citing cases).

[¶15.]     With that law in mind, we now examine whether the circuit court erred when it concluded that Gaters was a social guest simply permitted on the premises. Gaters had the burden to "demonstrate a personal and reasonable expectation of privacy in the place searched." *See Hess*, 2004 S.D. 60, ¶ 11,

680 N.W.2d at 320; *Tullous*, 2005 S.D. 5, ¶ 6, 692 N.W.2d at 792. At the suppression hearing, Gaters presented the following evidence—his testimony:

> **Counsel**: Mr. Gaters, from January 23rd until March 3rd, where did you reside?
>
> **Gaters**: Unit C in the South Dakota State Penitentiary.
>
> **Counsel**: And were you released on probation or parole on the 3rd of March?
>
> **Gaters**: Yes, on parole.
>
> **Counsel**: And thereafter did you return to Brookings?
>
> **Gaters**: Yes, I did.
>
> **Counsel**: And where did you reside?
>
> **Gaters**: At my friend's house out in, on north on Medary, just outside of Brookings. [(Note: This is not Jones's trailer.)]
>
> **Counsel**: Is that at the trailer houses that are located on 471st Avenue about three miles north of Brookings?
>
> **Gaters**: Yes.
>
> **Counsel**: And what is your relationship with Mr. Jones?
>
> **Gaters**: He is a very close friend of mine.
>
> **Counsel**: During your incarceration he was caring for an animal of yours?
>
> **Gaters**: Yeah, he was watching my cat for me.
>
> **Counsel**: And on a particular day that the search warrant was executed, were you at his residence?
>
> **Gaters**: Yeah, he had gotten ahold of me that morning and said that my cat had gotten out and so I went over to help to try to find him.
>
> **Counsel**: Had you visited Mr. Jones's residence often?
>
> **Gaters**: Yes, as I stated he is a good friend of mine.

Counsel for Gaters objected to two of the three questions asked by the State on cross-examination, leaving only the question: "You were in Mr. Jones's residence when the search warrant was executed, correct?" Gaters answered, "Yes."

[¶16.]     Gaters's evidence establishes that he and Jones are good friends, that Jones took care of Gaters's cat, and that Jones called Gaters to come over on March 19 because Gaters's cat went missing. On appeal, Gaters asks us to infer that he was at Jones's home often because his van was parked there and because Detective Rogers testified that he had observed someone resembling Gaters enter Jones's home on previous occasions. But Gaters, as the party seeking to invoke protection under the Fourth Amendment, must present evidence to support his claim. *See State v. Krebs*, 504 N.W.2d 580, 586 (S.D. 1993). This he has not done.

[¶17.]     By comparison, in *Hess*, the defendant presented evidence that he had an intimate relationship with his girlfriend, had stayed overnight in her apartment on previous occasions, had a backpack at the apartment, had freedom to move about the apartment, and "was not just a visitor or party guest." 2004 S.D. 60, ¶ 17, 680 N.W.2d at 322. And in *Tullous*, the defendant demonstrated that he "had ready access to the home, that Hall [(the owner)] had shown him where he hid the house key and that Tullous had used the house key to enter the home when Hall was away." 2005 S.D. 5, ¶ 9, 692 N.W.2d at 794. Tullous also presented evidence that he regularly stayed the night at Hall's house and babysat for Hall in the house.

[¶18.]     Here, Gaters presented no evidence of "ownership, possession and/or control of" Jones's home—such as a key, a right to exclude others, a right to be present in Jones's absence. *See United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994) (listing factors to consider); *United States v. Davis*, No. 4:14-CR-00348-01-BCW, 2015 WL 3616751 (W.D. Mo. June 9, 2015). He also presented no evidence to support his historical use of Jones's home. Gaters simply relies on his long-standing

friendship with Jones, that Jones invited Gaters into his home the day of the search, and that Jones cared for Gaters's cat. This evidence does not "demonstrate a personal and reasonable expectation of privacy in the place searched." *See Hess*, 2004 S.D. 60, ¶ 11, 680 N.W.2d at 320. Nor does this evidence establish that Gaters had "a sufficiently close connection to the relevant places or objects searched[.]" *See Gomez*, 16 F.3d at 256.

[¶19.] From our review, the circumstances suggest a situation "closer to that of one simply permitted on the premises." *See Carter*, 525 U.S. at 91, 119 S. Ct. at 474. Therefore, Gaters has not met his burden that he had a subjective expectation of privacy in Jones's home that society would recognize as reasonable. Because Gaters did not establish a protectable interest in the property searched, the circuit court did not err when it denied Gaters's motion to suppress. In light of our holding on this issue, we need not examine whether law enforcement's use of the pole camera violated Gaters's Fourth Amendment rights.

[¶20.] Affirmed.

[¶21.] GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and KERN, Justices, concur.